ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Jaxon Construction, Inc. | )　　ASBCA No. 64432 |
| | ) |
| Under Contract No. W519TC-25-C-A037 | ) |

APPEARANCE FOR THE APPELLANT:　　　Mr. Michael E. Jackson
　　　　　　　　　　　　　　　　　　　　　President

APPEARANCES FOR THE GOVERNMENT:　　Dana J. Chase, Esq.
　　　　　　　　　　　　　　　　　　　　　 Army Chief Trial Attorney
　　　　　　　　　　　　　　　　　　　　　Carter Cassidy, Esq.
　　　　　　　　　　　　　　　　　　　　　LTC Anthony V. Lenze, JA
　　　　　　　　　　　　　　　　　　　　　MAJ Joseph A. Seaton, JA
　　　　　　　　　　　　　　　　　　　　　 Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE WOODROW
PURSUANT TO BOARD RULE 12.2

Appellant, Jaxon Construction, Inc., appearing *pro se* through its president, Michael Jackson, elected to proceed under the Board's Rule 12.2, Small Claims (Expedited) procedure. Accordingly, this decision has no precedential value, and in the absence of fraud is final and conclusive and may not be appealed or set aside. 41 U.S.C. § 7106(b)(4)-(5).

Jaxon appeals the contracting officer's December 22, 2025 decision terminating its roof-repair contract for default. Jaxon asks the Board to convert the termination for default into a termination for the convenience of the government. The Board held a one-day virtual hearing on May 28, 2026.

The government proved serious deficiencies in Jaxon's contract administration: missed initial submittal deadlines, unacceptable foundational preconstruction documents by the extended cure deadline, and no physical roof work before termination. Those facts matter, but the issue is the government's burden in a pre-completion default. Considering the full record—including winter-work constraints, the contracting officer's reference to a possible winter hold, the uncommunicated safety deficiencies, and the absence of an unequivocal refusal to perform—the government did not prove that default termination was justified. The appeal is sustained.

FINDINGS OF FACT

1.  On August 22, 2025, the Army awarded Contract No. W519TC-25-C-A037 to Jaxon for $438,765 to remove and replace the low-slope EPDM roof on the Building 222 Annex at Rock Island Arsenal.  The firm fixed-price contract required performance inside a secure military installation, including work near or within a munitions area, completion within 80 working days after the Notice to Proceed, and physical construction to begin within 30 workdays after the Notice to Proceed.  (R4, tabs 2, 27, 120; tr. 23-24, 45, 77)

2.  The Scope of Work required a practicable schedule and Quality Control Plan within 15 days after the Notice to Proceed, remaining technical, safety, and material submittals within 30 days, and use of ENG Form 4025-R for submittal processing (R4, tabs 2 at 49, tab 27 at 523, tab 29 at 583; tr. 27, 29-31, 79, 118).

3.  Contractor personnel had to comply with installation access procedures, including NCIC-III screening and in-person operational-security or munitions-area training before unescorted work in the secured area (R4, tab 2 at 51-53, tab 28 at 558-60; tr. 24-26, 43-46, 88-89).

4.  The parties executed the Notice to Proceed on September 18, 2025, making Jaxon's practicable schedule and Quality Control Plan due October 3 and the remaining preconstruction submittals due October 18 (R4, tab 44; tr. 27-28, 79).

5.  On September 18, Mr. Jackson traveled to Rock Island Arsenal for the preconstruction conference but was denied access.  The contracting officer's representative (COR), Jason Rupe, sent Jaxon an access form on September 8, but Mr. Jackson did not return a completed form.  Jaxon's operations manager, Daniel McKibben, passed screening, accessed the installation, and attended the conference.  (R4, tabs 43, 121, 130; tr. 24-26, 65, 159-64)

6.  Mr. Jackson received written denial and appeal information with telephone, email, and mailing instructions.  He did not submit the written appeal documentation or certified court records through that process, although he credibly testified that he called the installation contact four times and that Jaxon raised the issue through the COR and an RFI.  (R4, tabs 121, 130; tr. 161-65)

7.  We do not find that the government improperly locked Jaxon out, actively hindered performance, breached the duty of good faith and fair dealing, or caused an excusable delay by denying Mr. Jackson access.  The denial principally resulted from Jaxon's failure to complete prescreening and pursue the written appeal process (R4, tabs 43, 121, 130; tr. 25-26, 88-89, 159-65).

8. The access issue nonetheless is part of the startup context. Jaxon had to verify existing site conditions, including the roof assembly. On September 23, Jaxon asked for roof-deck and core-sample information, explaining that security requirements prevented the intended site evaluation. Mr. Jackson testified that Jaxon normally would not prepare the Accident Prevention Plan and other technical submittals without physical site information. (R4, tab 2 at 47; tab 51 at 952; tr. 176-77, 193-97)

9. The federal government shutdown began on October 1, 2025. The contracting officer and COR were available to administer this fully funded contract, and the contracting officer told Jaxon on October 6 that the shutdown did not suspend administrative deadlines. The government's first review of Jaxon's initial submittals took 15 days, exceeding the contract's targeted 10-day period. (R4, tab 51 at 946; tr. 28-29, 42, 80-81, 90, 105, 119-21)

10. The shutdown nevertheless complicated startup. The contracting officer acknowledged that her email had an out-of-office message, that she had not provided alternate contact information, that she checked email only every other day or as needed when called, and that non-excepted personnel could not work (tr. 119-21)

11. Jaxon did not submit its practicable schedule or Quality Control Plan by October 3. Mr. Jackson acknowledged the missed deadline and that missing submittal deadlines on an 80-working-day project made timely completion harder. (R4, tab 51 at 946-48; tr. 27-28, 42, 105, 165-66, 197)

12. On October 16, Jaxon submitted material submittals without an acceptable practicable schedule or Quality Control Plan. The COR rejected some submittals because they did not properly use ENG Form 4025-R or were locked or uneditable. (R4, tab 52; tr. 29-31, 49-52, 101)

13. Jaxon executed a subcontract with Economy Roofing on October 7, according to Mr. Jackson. By December 3, Jaxon had not provided a binding plumbing subcontract, submitting only an unexecuted proposal, and proposed an Alternate Site Safety and Health Officer who lacked the required five years of construction-safety experience. The contracting officer confirmed that the contract did not require a licensed plumber or electrician, contrary to the Notice of Termination's wording, although the work itself remained required. (R4, tabs 119-20, 126, 131; tr. 34-37, 99-100, 111, 122-23, 137-38)

14. On November 19, the contracting officer issued a cure notice citing failure to make progress, maintain the schedule, submit required administrative documentation, and commence physical work. The notice gave Jaxon ten days to cure. (R4, tab 75; tr. 82)

3

15.  On November 20, Jaxon submitted a Practicable Schedule Submission Package proposing spring 2026 roof work and April 2026 completion.  The proposal sought a substantial extension, but also responded to the contracting officer's direction to show the working days needed for physical completion.  (R4, tab 84; tr. 84, 189)

16.  Before termination, the parties discussed winter limitations and a possible winter hold.  The COR testified that EPDM could not be installed below 40 degrees Fahrenheit and that completion by January was impossible as of December 3.  The contracting officer testified that, if Jaxon's December 3 submittals had been approved, the government would have considered a winter hold and a feasible schedule extending to about April 1 (R4, tabs 84, 86; tr. 33, 47-48, 84-85, 102, 117, 137-38)

17.  Winter holds were common at Rock Island Arsenal: the COR testified that they are used every year, are rarely denied for outdoor work unless absolutely necessary, and are used on roughly 90 percent of outdoor contracts.  He acknowledged that an early-December winter hold would have given Jaxon ample time to complete submittals before spring work, but that option was not discussed with Jaxon.  (Tr. 71-72)

18.  On November 25, the contracting officer denied a formal modification but extended the cure deadline to December 3.  She told Jaxon to submit accurate submittals and a practicable schedule showing working days required for physical completion, and stated that, if the submittals were acceptable, the parties would discuss remaining working days and a possible winter hold.  Jaxon replied that it would proceed accordingly and in reliance on the discussed winter hold.  (R4, tab 77 at 1151, tab 86 at 1227-28; tr. 82-85, 102)

19.  Jaxon submitted revised materials by December 3, including an Accident Prevention Plan, Quality Control Plan, and proposed spring schedule.  It also requested meetings to resolve issues, but the government required email communications. Mr. Jackson testified that Jaxon hired an additional person to help push the contract through.  (R4, tabs 84, 86, 118-19; tr. 56, 58, 85, 92, 137)

20.  The government found Jaxon's December 3 submissions deficient.  The critical unapproved items included the practicable schedule, Quality Control Plan, safety plan, subcontractor list or trade identification, and other administrative items. Some submittals had been approved, but critical ones had not.  (R4, tabs 118-20, 128; tr. 33-34, 85-86, 103)

21.  The government identified eight Accident Prevention Plan deficiencies, but the contracting officer testified that they were not communicated to Jaxon before termination.  She testified that the information might have helped Jaxon correct them,

but that the government was not allowing further corrections because the termination decision had been made. (Tr. 86, 117-18)

22. On December 10, the COR evaluated Jaxon's final submittals as better but still incomplete or unacceptable and recommended that the contracting officer consider termination. The contracting officer testified that she independently considered the matter, considered liquidated damages internally, and concluded that she had no confidence Jaxon could complete on time. She did not discuss liquidated damages with Jaxon. (R4, tab 128; tr. 55-56, 85-88, 95, 103)

23. The termination rationale referred to urgency associated with the damaged roof. The COR testified that the roof was damaged but that the government's inspection report found it in okay condition without active leaks, and that the government did not tell Jaxon during performance that an active leak required immediate attention. (R4, tabs 118-19; tr. 58-59)

24. On December 22, the contracting officer terminated the contract for default under FAR 52.249-10. Jaxon had performed no physical roofing work, had not purchased materials, and had incurred only site-visit and incidental expenses toward physical performance. The 80-working-day performance period had not expired; a draft modification would have set the period through January 14, 2026 but was never executed. (R4, tabs 118-20; tr. 85-86, 175; answer, Part II ¶ 23)

25. At the hearing, Mr. Jackson sought reimbursement of receipts, damages for missed contracts, and compensation for emotional damage. The record does not show that Jaxon submitted any monetary claim for a sum certain, any certified claim exceeding $100,000, or any contracting officer's final decision on those monetary demands. (R4 *passim*; tr. 141, 144-46)

26. The Board found Mr. Jackson, Mr. McKibben, the contracting officer, and the COR credible. The dispute is over the legal significance of the facts, not witness truthfulness. The contracting officer reasonably considered Jaxon's poor submittal performance and the risks to the government; the question is whether those concerns satisfy the government's burden for default termination. (Tr. *passim*)

## I. The Government Bears the Burden of Proving That Default Was Justified

A termination for default is a drastic sanction, sustainable only on good grounds and solid evidence. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987). Because a default termination is treated as a government claim, the government bears the burden of proving that the termination was justified.

Where the government terminates before the performance period expires, it must prove that, at termination, the contracting officer reasonably concluded there was no reasonable likelihood the contractor could complete the work within the time remaining. *Lisbon*, 828 F.2d at 765. That conclusion must rest on tangible evidence of impaired timely completion and the totality of the circumstances. *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1016-17 (Fed. Cir. 2003); *Discount Co. v. United States*, 213 Ct. Cl. 567, 554 F.2d 435, 441 (1977). Falling behind, or creating concerns about milestones or specifications, is not enough. *McDonnell Douglas*, 323 F.3d at 1015 (citing Lisbon, 828 F.2d at 765).

Jaxon's performance was deficient. It missed the October 3 schedule and Quality Control Plan deadline, submitted defective or incomplete materials, lacked approval of critical preconstruction submittals by the extended December 3 cure deadline, and performed no physical roof work before termination (findings 11-12, 19-20, 24). Those facts gave the contracting officer legitimate concerns, but the remaining question is whether they justified default before expiration of the performance period when both parties understood that physical roofing work could not reasonably proceed until spring.

## II. The Government Did Not Prove That Jaxon Could Not Complete Within a Realistic Performance Period

This is a close case. The contracting officer did not act arbitrarily, in bad faith, or with improper motive. She reasonably considered Jaxon's missed deadlines, unapproved critical submittals, lack of physical progress, the COR's technical assessment, and the government's interest in replacing a damaged roof (findings 20-24, 26). The COR and contracting officer were credible witnesses, as were Mr. Jackson and Mr. McKibben (finding 26).

Nor does this turn on a failure to mechanically recite FAR 49.402-3. The contracting officer could rely on the COR's technical advice, and she considered at least one alternative, liquidated damages (finding 22). The problem is not subjective good faith; it is the absence of solid, objective evidence that, as of December 22,

6

Jaxon's deficiencies made completion on a realistic spring schedule unreasonable to expect.

The default decision rested on lack of progress, missed administrative deadlines, and deficient submittals (findings 11-12, 19-20). But the record does not show that those deficiencies were incurable before spring or made completion unlikely within the realistically available performance period. The government cannot meet its burden merely by invoking the original January timeframe when its witnesses acknowledged that completion by then was not realistic. It had to prove that Jaxon could not cure its submittal problems and complete the work on a realistic spring schedule. It did not.

Jaxon's December 3 submissions were deficient, and the government rejected the Quality Control Plan and identified eight Accident Prevention Plan deficiencies (findings 20-21). But the contracting officer did not communicate those safety deficiencies before termination and did not allow further corrections because the decision to terminate already had been made (finding 21). Uncommunicated deficiencies show that a submission was unacceptable as drafted; they do not prove inability or unwillingness to correct within the time that would have existed under a winter hold.

Nor was Jaxon's spring 2026 schedule an anticipatory repudiation. Repudiation requires a definite and unequivocal statement that the contractor will not perform or reasonable grounds supporting the belief that the contractor will not perform. *See Danzig v. AEC Corp.*, 224 F.3d 1333, 1337-38 (Fed. Cir. 2000), *cert denied*, 532 U.S. 995 (2001); *also Free & Ben, Inc.*, ASBCA No. 56129, 11-1 ¶ 34,719 at 170,954 (discussing examples of anticipatory repudiation). Jaxon submitted revised materials, requested meetings, and proposed a spring schedule in response to the contracting officer's request for working days needed and her reference to a possible winter hold (findings 15-19). In our view, that was a request for time and an assurance of continued performance, not a refusal to perform.

The access issue likewise does not justify default. Mr. Jackson's access denial resulted from Jaxon's failure to complete prescreening and pursue the written appeal process (findings 5-7). We do not find a lockout, active hindrance, breach of good faith, or excusable delay. But the access and training issues were part of the startup circumstances known to the contracting officer (findings 7-8). Jaxon promptly raised concerns about information needed to verify roof conditions and prepare technical and safety submissions (finding 8). That does not excuse Jaxon's failures, but it weakens the claim that the record contains solid evidence of incurability.

## III. The Government's Schedule and Repudiation Theories Do Not Cure the Burden Problem

The government argues that Jaxon failed to maintain the schedule and that its proposed April 2026 completion date showed an inability to perform. The record supports concern, not default.

The contracting officer's November 25 email extended the cure deadline to December 3, required a schedule showing working days for physical completion, and stated that acceptable submissions would lead to discussion of remaining working days and a possible winter hold (finding 18). Jaxon's spring schedule reflected the winter limitations both parties understood (findings 15-17). Because the government's witnesses confirmed the original winter timeframe was unrealistic, the government still had to prove that Jaxon could not perform within a reasonably allowed time, even absent formal waiver. It did not.

## IV. The Government's Authorities Do Not Support Default on These Facts

The government's failure-to-progress authorities are distinguishable. In *ECC CENTCOM Constructors, LLC*, ASBCA No. 60647, 18-1 BCA ¶ 37,133, the show-cause notice was issued after the completion date, the contractor was 124 days late and roughly half complete after repeated missed schedules, and it proposed completion more than eight months late. In *MOQA-AQYOL JV, Ltd.*, ASBCA Nos. 57963, 60456, 17-1 BCA ¶ 36,909, only 22 days remained, the contractor had completed little more than a defective foundation, and it conceded it could not finish. *Id.* at 179,826. Here, the performance period had not expired (finding 11), physical roof work was seasonally deferred until spring for reasons unrelated to Jaxon's diligence (findings 8, 12, 16-17), and the cure effort was focused on submittals (findings 9-10). Jaxon's April 2026 date tracked the spring restart the government's witnesses said weather required (finding 17).

The government's jurisdictional argument about Jaxon's lack of a certified delay claim also does not decide the case. A contractor may defend against a default termination by contesting the government's prima facie case without first submitting a claim; only affirmative relief changing contract terms, such as a time extension or equitable adjustment, must be presented to the contracting officer. *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1331 (Fed. Cir. 2010). Because the government did not carry its threshold burden, the Board need not reach concurrent-delay or causation arguments.

The Board also need not decide waiver under *DeVito v. United States*, 188 Ct. Cl. 979 (1969). The narrower point is that the government did not prove Jaxon's deficient submittals and proposed spring completion date established no reasonable

likelihood of completion. *DeVito* ordinarily addresses performance allowed after an expired completion date, which had not occurred here (finding 11).

Finally, the government's "prosecuting the work" argument underplays startup context. Jaxon's October 3 failure was partly bound up with lack of site access to verify roof conditions before preparing technical and safety submittals (findings 5-8, 11). The contract remained funded and deadlines remained in place, but the contracting officer's out-of-office message and limited email availability during the shutdown made startup more difficult than normal (findings 9-10). Again, these facts do not excuse Jaxon's failures, but they undercut solid proof that Jaxon could not cure and complete within a realistic period.

## V. Jaxon's Oral Demands for Money and a Time Extension

At the hearing Jaxon sought reimbursement for "receipts," damages for lost contracts, and "emotional damage" (finding 25). Those affirmative monetary demands and any affirmative time-extension request were never presented to the contracting officer as certified claims stating a sum certain. The Board's jurisdiction extends only to claims properly presented to and decided by the contracting officer; claims exceeding $100,000 must be certified; and Rule 12.2 caps the amount in dispute at $150,000. 41 U.S.C. §§ 7103(b)(1), 7106(b); *Maropakis*, 609 F.3d at 1331. We dismiss those demands for lack of jurisdiction. That dismissal does not affect conversion of an unjustified default termination, which requires no separate certified claim.

## VI. Conversion to Termination for Convenience

FAR 52.249-10(c) provides that, if a default termination is later determined improper or the delay excusable, the parties' rights and obligations are the same as if the termination had been issued for convenience.

The government did not carry its burden of proving that the default termination was justified. The termination for default is therefore converted to a termination for the convenience of the government.

<u>CONCLUSION</u>

The appeal is sustained. The December 22, 2025, termination for default is converted to a termination for the convenience of the government. Jaxon's affirmative demands for monetary relief and a time extension are dismissed for lack of jurisdiction. Any termination-for-convenience costs are for the parties to address in the first instance.

Dated: June 24, 2026

KENNETH D. WOODROW
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 64432, Appeal of Jaxon Construction, Inc., rendered in conformance with the Board's Charter.

Dated: June 24, 2026

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

10